**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| PROVIDENCE PROPERTY & CASUALTY INSURANCE COMPANY, | § § § | |
| Plaintiff and Counter-Defendant, | § | |
| v. | § § | CASE NO. 4:06cv285 |
| PEOPLEASE CORPORATION AND PLCSERVICES, INC., | § § § | |
| Defendants and Counter-Plaintiffs, | § | |
| v. | § § | |
| PROVIDENCE HOLDINGS, INC. and IMPERIAL CASUALTY AND INDEMNITY INSURANCE COMPANY, | § § § | |
| Counter-Defendants. | § | |

**REPORT AND RECOMMENDATION OF UNITED STATES
MAGISTRATE JUDGE GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Now before the Court is Plaintiff's and Counter-Defendants' Motion for Summary Judgment

and Brief in Support (Dkt. 37). Providence Property & Casualty Insurance Company (Providence),

Imperial Casualty and Indemnity Company (Imperial) and Providence Holdings, Inc. (PHI) seek

summary judgment relief against PeopLease Corporation for damages and other relief related to

workers' compensation insurance. On October 29, 2007, the Court heard oral argument on the

Motion. After considering the argument, credible summary judgement evidence and briefs, the

Court grants the motion in part and denies the motion in part.[1]

---

[1]The Court has addressed the parties' objections to summary judgment evidence (Dkts. 53 and 107) in separate orders.

# BACKGROUND

According to Providence's motion, PeopLease is a professional employer organization which provides human resource services for its client businesses.  Most of its placed professionals are truck drivers, and the majority of its clients are trucking companies.  Providence alleges that PeopLease was in crisis mode to find a new workers' compensation carrier.  In May 2003, Speer, PeopLease's Director and Vice President, contacted Jerry Lancaster, Providence's Marketing Director and Board Member, about the possibility of Providence writing PeopLease's workers' compensation program.  Lancaster told Speer that Providence was not interested in writing the business.  Providence was a new company, having just started business in January 2003.

According to Providence, Speer persisted.  On May 16, 2003, Speer sent Lancaster some information concerning PeopLease's loss experience, payroll, and financial status.  Lancaster again expressed disinterest in writing the business.  On the last day of June 2003, Speer did succeed in meeting with Lancaster.  Apparently, PeopLease needed coverage for the following day because its coverage was to expire at midnight.

As a result of the meeting, Lancaster decided to write the business.  After PeopLease obtained temporary reinsurance, the parties had to agree upon the key components of the program and how it would be funded.  Ultimately, they were able to outline the general terms of the agreement in a June 30, 2003 proposal accepted that day by Speer.

The June 2003 proposal provides for a $1,000,000 deductible for each and every claim, with no aggregate.  The premium is set at 37% of Manual Premium, paid weekly, based on actual payroll from the previous week.  *See* Dkt. 37, Providence Ex. B-2.

Under the proposal, Providence was to invoice PeopLease twice monthly for *paid* claims. PeopLease was to be responsible for the developed claims (less paid claims) due and payable at year's end.   Providence had the *sole and complete rights in determining incurred claims development.  See* Dkt. 37, Providence Ex. B-2 (emphasis added).

PeopLease also agreed to loan Providence 35% of Manual Premium to PHI as a surplus note payable on an agreed schedule.  This was evidently done to satisfy Oklahoma Insurance Regulations for capitalization.  Neither party appears to dispute why the loan was made, only how the loan was to be treated or repaid.

The parties also agreed to a claims collateral equal to 125% of the Loss Pick.   According to Providence, the sum represented a fund to cover incurred claims or developed claims not paid by PeopLease.  The total payment due Providence for Claims Collateral was $10,000,000, payable over the first year of the coverage.

Providence then issued a workers compensation and employers liability insurance policy to PeopLease.  The policy provides in part that "(t)he only agreements relating to this insurance are stated in the policy."  Providence claims that the proposals dealt with how the $1,000,000 coverage for each claim would be funded and/or reserved to insure that Providence had enough funds to pay a $1,000,000 deductible for each claim, which was PeopLease's responsibility.  PeopLease claims that the "integration clause" of the insurance contract abrogates any responsibility for payments other than the stated premium, or, in the alternative, the three proposals covering the three year policy period are too ambiguous and cannot be enforced.

3

Shortly after the first proposal was signed by the interested parties, Providence sent Speer a letter

stating that premiums for South Carolina employees would be assessed at the billed rate of 42%

of manual premiums and that Providence would be billed for incurred claims bimonthly.

*See* Dkt. 37, Providence Ex. B-5.

### *The First Year (or the Honeymoon period)*

Regardless of the arguments now advanced by PeopLease, the parties appear to have

proceeded in harmony for the first year of the policy period.  Both parties signed and agreed to the

terms as proposed.  *See* Dkt. 37, Providence Ex. B-2.  According to Speer's affidavit, PeopLease

paid a total of $3,473,480 in claims collateral during 2003, the first year of the policy.  Speer admits

that the policy was in effect a self insurance program whereby Providence was only liable in case a

claim exceeded $1,000,000.  As Providence's counsel stated, in return, PeopLease obtained a policy

approved by the various states.

The proposal also required that PeopLease fund a surplus loan.  Several drafts of the

proposed loan were sent between the parties, but no final document was ever signed by each party.

Nevertheless, PeopLease funded $4,800,000 for the loan while drafts of the agreements floated back

and forth between the parties.  According to the parties at oral argument, because of the capital

required by insurance regulations, Providence needed to show this sum on its books to be able to

write PeopLease's business.  Speer says that Providence orally agreed to repay the loaned amount,

but no interest rate was ever agreed upon although the draft agreements reflected interest at the rate

of 3% per annum.

Also PeopLease paid incurred claims for the first policy year.  As explained at oral argument, once a claim was received, it would be paid and a reserve established which estimated the total amount that might have to be paid on the claim.  The amount paid plus the "reserve" was the "incurred claim" for which PeopLease was billed.  Although the first agreement referred to reimbursement of paid claims (but was subsequently modified to refer to incurred claims), "developed claims" were always  based on incurred claims.

Added to the mix is the fact that there is never any definition of "incurred claim."  At oral argument, Providence's counsel stated that the parties understood the concept as one familiar to the industry.  PeopLease's counsel did not take issue with the statement and, in fact, stated that before policy termination, PeopLease had paid all incurred claims.

Much argument has been focused on the PeopLease's liability for "developed claims."  The initial proposal stated that payment was at year's end.  The proposal also allowed Providence to set the rate.  PeopLease argues that the agreement is no model of clarity as to how this amount was to be calculated.  Providence's response is that it doesn't matter since PeopLease always agreed to and accepted the calculations.  *See* Dkt. 37, Providence Ex. B-10.

On July 21, 2004, Providence sent Speer a letter which outlined the developed claims for the first policy year.  The summary indicates a value for incurred claims less paid claims, leaving a reserve number.  The factor chosen is 1.80. Applying this factor to the reserved claims and subtracting what has been reserved (instead of paid pursuant to the proposal), resulted in a developed claim number of $2,209,443.

Providence gave PeopLease the option of paying the claim over 12 months.  PeopLease paid all but the last monthly payment of $184,120.25.  Speer claims that this last payment was "waived" by Providence.

This proposal was accepted in writing by Speer, and the first payment was made in August 2004.  Speer states that "(i)t is agreed we will look at this trending for a 'shore up' next renewal, July 1, 2005," but no party sheds any light on this statement.  *See* Dkt. 37, Providence Ex. B-10. Providence Exhibit 10 is also clear that each year hereafter PeopLease would be billed for increases in the developed claims, if any.  *Id.*  But there is no explanation as to how the increases are calculated.

It appears that Providence simply recalculated the claim based on total incurred claims for all policy years.  However, since PeopLease had already paid developed claims for one year, any increase calculated by Providence did not take into account the developed claim already paid.  Any increase, as calculated by Providence, could potentially result in a double stacking of developed claims.

PeopLease does not address this in its arguments.  Counsel merely contends that charging for incurred claims and developed claims results in double billing.  Providence denies that it has "double billed" PeopLease.  Providence maintains that the developed claims calculation was a further guarantee or safety net that the insured would not terminate the policy and leave Providence on the hook for millions of dollars in incurred, but unpaid, claims which would have been PeopLease's responsibility in the first place.

6

Thus, to guarantee enough money in this largely self-insured program with coverage for only catastrophic claims, Providence required payment of claims collateral , incurred claims development payment at the end of the first policy year, *and* bi-monthly reimbursement of incurred claims— which not only included paid claims but the reserves as established on those claims by Providence in addition to a hefty premium presumably for its catastrophic coverage and claims handling services— not to mention a loan of $4,800,000, all which PeopLease for the most part paid without objection in year one.  Now, PeopLease states that the agreement was ambiguous and the proposals should not be enforced due to the parole evidence rule—  more about these twelfth hour arguments later on.

### *Year Two (The interlude)*

In June of 2004, the parties signed a proposal for the second policy year.  Providence waives its surplus deposit requirement in that it has PeopLease's $4,800,000 which it terms surplus. Providence also waives its requirement for claims collateral acknowledging that it has $3,181,815 held as a claims deposit.  Providence, in effect, lowers its premiums for some classification of workers and charges a uniform premium.  Providence states that it will continue to collect "incurred claim reimbursement" on a monthly basis.  Providence also indicates that it is having an actuarial report completed on PeopLease and developed claims will be billed once the report is finalized. Without a protest or complaint, PeopLease signs and accepts the proposal.

It is after this proposal that PeopLease receives the letter from Providence which is titled "Trending of Incurred Claims for the Policy Year Ending June 30, 2004."  *See* Dkt. 37, Providence Ex. B-10.  It is not clear whether this is the claims development referred to in the June 2004

proposal, but it is the first presentment of a claim for developed claims and it references the end of the first policy year.  As stated before, Speer signs and accepts the calculated amount.  Of note, the Court finds no agreement by PeopLease to pay developed claims in the second policy year.

### *Year Three (The divorce)*

The June 24, 2005 Workers' Compensation Proposal-Revised Renewal contains several items not previously covered in the two prior proposals.  *See* Dkt. 37, Providence Ex. B-14.  First, PeopLease will be responsible for all state assessments on the attached lists to the proposal.  At argument, the parties agreed that the list covered assessments for 2005.  However, on June 15, 2005, Speer enclosed a check for the first two years of assessments stating, "(o)ne of the conditions of renewal was to pay the state assessment and taxes Steve Gober provided.........We would like to start the re-issue of our workers' compensation certificates today if possible."  *See* Dkt. 37, Providence Ex. B-13.  This letter is sent before the revised renewal proposal.  PeopLease now contends that, according to Speer's affidavit, Speer and his accounting department inadvertently paid the bill for state assessments for the two prior policy years.

The revised renewal also states that PeopLease is responsible for the total of the developed claims at due and payable at policy's year end.  Under the renewal, Providence has the sole and complete rights in determining incurred claims development.  There is also a notation that Providence will develop the incurred claims based on accepted actuarial principles.  The proposal also states that losses will again be developed at the end of the policy period.  This is the only reference in the three proposals to development of losses.  The proposal also states that the value of incurred claims are the financial responsibility of PeopLease Corporation.  The proposal is signed

by Speer and Lancaster.  However, PeopLease claims that added modifications to the agreement relating to the conversion of the $4,800,000 loan for the purchase of preferred stock were never accepted by Lancaster and thus there was no meeting of the minds as to the proposal for the third policy year.

On October 7, 2005, Providence invoiced PeopLease for adjusted first year policy claims and also invoices for second year policy claims.  Providence departs from its practice in developing the claims and, for both years, doesn't subtract paid claims from the developed reserve number.  Providence's response is that it doesn't matter because Speer accepted the payment program on November 31, 2005 (sic).  *See* Dkt. 37, Providence Ex. B-17.  On November 18, 2005, Speer informs Lancaster that PeopLease is terminating its coverage effective November 30, 2005.  .  *See* Dkt. 37, Providence Ex. B-18.

### STANDARD

Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S. Ct. 1545, 143 L. Ed.2d 7 31 (1999).  The appropriate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986).

The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial.  *Provident Life & Accident Ins. Co. v. Goel,* 274 F.3d 984, 991 (5th

Cir. 2001).   In sustaining this burden, the movant must identify those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553, 91 L. Ed.2d 265 (1986).   The moving party, however, "need not negate the elements of the nonmovant's case."   *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).   The movant's burden is only to point out the absence of evidence supporting the nonmoving party's case.   *Stults v. Conoco, Inc*., 76 F.3d 651, 655 (5th Cir. 1996).

In response, the nonmovant's motion "may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial."   *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255-57, 106 S. Ct. at 2513-14).   Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record to show that there is a genuine issue for trial. *Stults*, 76 F.3d at 655.   The citations to evidence must be specific, as the district court is not required to "scour the record" to determine whether the evidence raises a genuine issue of material fact.   E.D. TEX. LOCAL R. CV-56(d).   Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the nonmovant's burden.   *Stults*, 76 F.3d at 655.

**ANALYSIS**

Having reviewed the evidence before it, the Court finds that the proposals were merely means to fund the $1,000,000 deductible owed by PeopLease on each claim.  There were separate and collateral agreements for the insurance program.  The insurance policy provided for excess risk coverage and the attendant services provided by Providence.

The insurance policy is not ambiguous.  The premiums were fixed for each separate policy.  As for the various proposals, the Court must determine whether they are ambiguous or if there was ever a meeting of the minds as the parties' responsibilities.

When a written contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous, and the court construes it as a matter of law.  *American Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex. 2003).  A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation.  *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex. 1996).  It is proper to allow the trier of fact to interpret an ambiguous contract.  *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex. 1983).  Not every difference in the interpretation of a contract amounts to an ambiguity.  *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex. 1994).  And, when a potential ambiguity arises, deciding whether the language is ambiguous is an issue of contract construction.  *Candlelight Hills Civic Ass'n, Inc. v. Goodwin,* 763 S.W.2d 474, 477 (Tex. App.- Houston [14th Dist.] 1988, writ denied).

However, individual words, phrases, or clauses should not be isolated and read out of context, but rather the document should be read as a whole to determine the intentions of the parties as expressed in the writing.  *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex. 1995).

11

To achieve this, the court will examine and consider the entire instrument so that none of the provisions will be rendered meaningless. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 519 (Tex. 1980). If the written instrument permits the court to ascertain a definite interpretation as to which one of two possible meanings is proper, the contract is not ambiguous. *Id.* It is presumed that the parties to a contract intend every clause to have some effect. *Heritage Res., Inc.,* 939 S.W.2d at 121.

If, however, the language of a contract is subject to two or more reasonable interpretations, it is said to be ambiguous. *Id.* Only after a contract is found to be ambiguous may parol evidence be admitted for the purpose of ascertaining the true intentions of the parties expressed in the contract. *Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 283 (Tex. 1996). In particular, a specialized industry or trade term may require extrinsic evidence of the commonly understood meaning of the term within a particular industry. *See Nat'l Union,* 907 S.W.2d at 521.

*Unpaid Premiums*

There is no disagreement between the parties as to the meaning of "manual premiums," and there is a clear obligation under the policy to pay such premiums. The policy gives Providence the right to an audit to determine audited premiums. This it did and determined that for the second policy year PeopLease owed $923,387. There is no evidence to the contrary. Therefore, summary judgment is granted for Providence in the amount of $923,387. Further, summary judgment is granted for Providence's request for declaratory judgment as to its right to access PeopLease materials as part of its audit of policy year one (2003-2004) and the last 5 months of policy year three (2005).

12

## *Claims Collateral*

As to claims collateral, the Court finds no ambiguity.  There is a fact issue as to whether the last month installment for 2004 was waived.  However, the Court finds that under the third year proposal, there is no ambiguity as to the amount due.  The claims collateral is determined by multiplying the estimated premium by 25%.  The third year policy was terminated after five months.  No premiums would be due after that date.  However, the policy provides that if PeopLease terminates the policy, the final premium will be more than *pro rata*.  It will also be increased by reference to a short rate cancellation table.  Therefore, the claims collateral due for year three is, at a minimum of $3,900,000, subject to adjustment by the policy's cancellation table.  Since there is no evidence as to this final amount, such is reserved for the fact finder.

## *Incurred Claims*

The proposals also provide that PeopLease will be billed twice monthly for incurred claims.  The first proposal, before it was unilaterally changed by Providence, provided for billing of *paid* claims.  Shortly after the policy period began, Providence began billing for incurred claims.  The second policy proposal states that it is the responsibility of PeopLease to reimburse *incurred* claims.  The word "incur" is defined in *Ashe v. Youngst,* 68 Tex. 123, 125, 3 S.W. 454, 455 (Tex. 1887), as "'brought on,' 'occasioned' or 'caused.'"  "To incur" has also been defined as "to suffer or bring on oneself (a liability or expense)."  BLACK'S LAW DICTIONARY (8th ed. 2004).  To reimburse implies that something has been paid which requires compensation for money spent.  *Foulston Siefkin LLP v. Wells Fargo Bank of Texas N.A.*, 465 F.3d 211, 215 (5th Cir. 2006).

13

PeopLease was obligated to pay any liability or expense associated with a claim.  In other words, it was obligated to pay what had been presented, not what liability it potentially could incur over a period of time.  Providence did not have the discretion to establish an incurred claim.  Its discretion was limited to the *development of incurred claims* at the policy's year end.

In practice, it appears that Providence developed claims twice, first when actually incurred and then at the policy year's end.  The Court finds by the clear and unambiguous terms of the contract that the term "incurred claims" means an existing claim that PeopLease is obligated to pay, not which it may ultimately have to pay.

<u>Developed Claims</u>

The year-end development of incurred claims was left to the discretion of Providence.  In effect, Providence was free to establish a reserve on incurred claims but only at the end of the year and do so in any manner it saw fit.  It was not free to establish a reserve once a claim came in and then, in effect, establish a reserve on an existing reserve.

The Court is unable to determine what the incurred claims were for each of the years, taking into account that Providence was not free to establish reserves on incurred claims.  However, the Court finds that Providence is entitled to seek reimbursement for developed claims at the numerical factors it cited in Exhibits 10 and 17 taking into account any increases.  *See* Dkt. 37, Providence Exs. B-10 & B-17.  However, there is no evidence before the Court at this time to determine what the amounts would be.

14

_State Assessments_

As  for state assessments, there was never a proposal which obligated PeopLease to pay first or second year policy assessments.  The only mention of state assessments is in the third proposal.  However, Speer sends a check to Providence acknowledging that payment of year one and two is essential for coverage.  Speer now states that the payment was in error.  Within this circuit, this court is not to make credibility determinations in deciding summary judgment motions.  _Anderson_, 106 S.Ct. at 2513; _Goodson v. City of Corpus Christi,_ 202 F.3d 730, 739 (5th Cir. 2000).  The Court finds that there is a fact issue.

However, the Court finds that PeopLease did agree to pay state assessments for policy year three.  The Court cannot, however, determine if the agreement to pay is one that should be prorated or not.  Therefore the Court finds that there is a fact issue as to PeopLease's ultimate obligation for state assessments in year three of the policy.

_Specific Performance of Loan_

Providence also requests specific performance of the proposal related to the $4,800,000 loan.  However, as already stated, there is a fact question as to whether there was a final contract between the parties as to the third proposal.  Specific performance is an equitable remedy committed to the trial court's discretion.  _Bell v. Rudd,_ 144 Tex. 491, 191 S.W.2d 841, 843 (1946); _Roundville Partners, L.L.C. v. Jones,_ 118 S.W.3d 73, 79 (Tex. App.- Austin 2003, pet. denied); _Scott v. Sebree,_ 986 S.W.2d 364, 368 (Tex. App. - Austin 1999, pet. denied).  At this time, the Court declines to hold as a matter of law that PeopLease has breached an agreement to purchase stock. Therefore, until a jury resolves the matter, Providence's request for this remedy is denied.

15

*PeopLease's Counterclaims*

Additionally, the Court finds that there is a fact issue regarding PeopLease's counterclaims, based on Providence's alleged bad faith and failure to properly administer and pay claims.  There is sufficient evidence before the Court to put Providence's claims handling at issue.  And, it is for the fact finder to determine what offset, if any, PeopLease is entitled to as a result of the manner in which Providence handled claims during the parties' almost three-year relationship.

## Recommendation

Based on the foregoing, the Court recommends that Plaintiff's Motion for Summary Judgment (Dkt. 37) be GRANTED in part and DENIED in part.

Within ten (10) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge.  28 U.S.C.A. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 7th day of November, 2007.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE
16